**Hal B. BENNETT, individually and on behalf of all others similarly situated, Plaintiff,**

v.

**FORD MOTOR COMPANY, Defendant.**

No. CIV.A.9:02–2201–08.

United States District Court,
D. South Carolina,
Beaufort Division.

Nov. 7, 2002.

---

Jack D. Simrill, Hilton Heal Island, SC, for plaintiff.

Kelly J. Riordan, O'Melveny and Myers LLP, Washington, DC, Deirdre Michelle Shelton-MCCool, Nelson Mullins Riley and Scarborough, Charleston, SC, Joel Haywood Smith, Nelson Mullins Riley and Scarborough, Columbia, SC, for defendant.

### ORDER

BLATT, Senior District Judge.

### INTRODUCTION

The Plaintiff's cause of action alleges generally that all 1993 Ford Thunderbird automobiles contain a defective engine gasket. The Defendant removed the action to this Court on both federal question and diversity of citizenship grounds, and simultaneously moved to dismiss. The Plaintiff filed a motion to remand. This Court held a hearing by telephone on September 5, 2002, at which the Court found that the Plaintiff had alleged a federal cause of action for negligent failure to recall, and ordered subsequent briefing on the motion to dismiss. A written order memorializing this hearing was entered on September 6, 2002.

This matter came before the Court on October 31, 2002, for a second telephone hearing on the Plaintiff's motion to reconsider the order of September 6, and on the Defendant's supplemented motion to dismiss the amended complaint. For the reasons stated at the hearing and clarified below, the motion to reconsider is denied, the "negligent failure to recall" cause of action is dismissed, and this Court, having dismissed the only federal question cause of action and having rejected the Defendant's arguments for original jurisdiction based upon diversity of citizenship, declines to exercise its supplemental jurisdiction over the remaining negligent design, negligent failure to disclose defects and breach of implied warranty causes of action.

### DISCUSSION

#### The "Economic Loss" Rule

The Court takes this opportunity to clarify and expand upon its decision not to exercise supplemental jurisdiction over the remaining state law causes of action. The central focus of the remaining negligence claims is that the "economic loss" rule bars any tort recovery.

> The rule states that an action will not lie in tort for a product defect without a claim of injury to the person or other property of the plaintiff. If the only damage is diminution in the value of the product itself, the plaintiff's remedy lies in contract, whether the loss results from inferior quality of the product, its unfitness for an intended use, its deterioration, or its destruction by reason of the defect.

See *Carolina Winds v. Joe Harden Builder*, 297 S.C. 74, 374 S.E.2d 897, 901 (S.C.App.1988) (giving the general rule), *overruled by Kennedy v. Columbia Lumber & Mfg. Co.*, 299 S.C. 335, 384 S.E.2d 730, 736–37 (1989). As noted at hearing, over the years its scope has been eroded in several areas. The Plaintiff here has argued that the economic loss rule is not applicable in this particular factual situation. After much debate and research, it is this Court's considered opinion that it is not in a position to offer an expansion of the existing law, as the Plaintiff asserts in

this case, but rather that this is a matter better left to the state courts.

The Fourth Circuit first explored the economic loss rule (without naming it as such) under South Carolina statutory law and the Restatement (Second) of Torts § 402A in a series of cases in the mid–1980s. In *Purvis v. Consolidated Energy Prods. Co.*, 674 F.2d 217, 222–23 (4th Cir. 1982), the court reasoned that "[w]hen a loss results from mere product ineffectiveness, it is the law of contracts and commercial transactions, rather than strict products liability, which fixes responsibility for the loss" (citations omitted). In *2000 Watermark Assn. v. Celotex Corp.*, 784 F.2d 1183, 1187 (4th Cir.1986), the court found that South Carolina case law (namely *Gray v. Southern Facilities, Inc.*, 256 S.C. 558, 183 S.E.2d 438 (S.C.1971)) supported a holding that "a negligence action cannot be maintained for an intangible economic loss." The United States Supreme Court, applying federal admiralty law, gave great support to the general rule in *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), when it found that "a manufacturer in a commercial relationship has no duty under either a negligence or a strict products-liability theory to prevent a product from injuring itself." Finding the Supreme Court's holding in *East River* "persuasive," the Fourth Circuit later found that "tort principles were simply inapplicable" to claims "simply of economic loss caused by the product's self-destruction." *Laurens Elec. Co–Op v. Altec Indus.*, 889 F.2d 1323, 1325–26 (4th Cir.1989).

However, the Fourth Circuit shortly distinguished the general rule in *Greenville v. W.R. Grace & Co.*, 827 F.2d 975, 977–84 (4th Cir.1987), holding, after lengthy discussion, that the installation of Monokote, a fireproofing product containing asbestos fibers, "endanger[s] the lives and health of the building's occupants." *Id.* at 978. "We think that the South Carolina courts would be willing to extend tort liability to the manufacturer whose product threatens a substantial and unreasonable risk of harm by releasing toxic substances into the environment, thereby causing damage to the property owner who has installed the harmful product in his building." *Id.*

The first South Carolina state court exception to the economic loss rule came with the *Kennedy* decision in 1989, in which the South Carolina Supreme Court reversed a Court of Appeals decision regarding the scope of the rule. In *Kennedy,* the court recognized that "a violation of a building code violates a legal duty for which a builder can be held liable in tort for proximately-caused damages," and that there is a "legal duty" on builders "to undertake construction commensurate with industry standards." 384 S.E.2d at 737. Based on these non-contractual duties, the court concluded that "any builder who violates such a duty should justly be held accountable for the losses that his breach caused, whether they be physical harm or the diminution of the value of the house." *Id.*

The South Carolina Supreme Court noted its "difficulty" with the economic loss rule in *Kershaw Cty. Bd. of Educ. v. U.S. Gypsum,* 302 S.C. 390, 396 S.E.2d 369 (1990), but did not need to further discuss the rule as the plaintiffs had alleged damage to "other property." Shortly thereafter, the court extended the *Kennedy* decision to include tort claims against architects in *Beachwalk Villas v. Martin,* 305 S.C. 144, 406 S.E.2d 372, 374 (1991). The court noted that the *Kennedy* decision limited the economic loss rule to "those cases where duties are created solely by contract." *Id.* n. 1. "Thus, a cause of action in negligence would be

available where a builder has violated a legal duty, no matter the type of resulting damage." *Id.* n. 1. The court eventually concluded that expansion of this exception to include architects "is a logical expansion of our law to provide protection for homebuyers." *Id.* at 474, 384 S.E.2d 730.

This Court (Columbia Division) undertook a lengthy analysis of the economic loss rule in *Myrtle Beach Pipeline Corp. v. Emerson Elec. Co.*, 843 F.Supp. 1027, 1048–55 (D.S.C.1993). Noting that prior cases involving the economic loss rule pertained to "sophisticated parties to a commercial transaction" who have "negotiated a contract," the court found no tort liability for specially-made commercial products which turned out to be defective, causing a large fuel leak and subsequent clean-up. *Id.* at 1053–54. The court reasoned that principles of contract law applied to such a situation, and that "if Myrtle Beach could bring its tort action the Uniform Commercial Code would be totally eviscerated, and the action of the General Assembly of South Carolina in enacting it would be rendered nugatory." *Id.* at 1054–55.

This same year, the Court (Charleston Division) held in *SCE & G v. Westinghouse Elec. Co.*, 826 F.Supp. 1549, 1555–57 (D.S.C.1993), that potential (but not actual) radioactive leakage from a faulty power plant was not sufficient to excuse the economic loss rule, distinguishing the *Greenville* decision of 1987. The court dismissed the plaintiffs' negligent design and manufacture causes of action, "which can be remedied in contract." *Id.* at 1556. The court also dismissed the negligent misrepresentation cause of action under the economic loss doctrine. *Id.* at 1557. The *Westinghouse Elec.* decision was cited by the Eastern District of Louisiana to bar recovery from Ford Motor Co. for alleged latent defects in automobile paint, of which Ford allegedly knew and concealed. *See*

*In re Ford Motor Co. Vehicle Paint Litig.*, 1996 WL 426548, at *2–3 (E.D.La. July 30, 1996). The *Ford Motor Co.* court, however, refused to dismiss the plaintiffs' allegations of fraud, "in the absence of authority requiring the application of the economic loss rule" in such a situation. *Id.* at *9.

The reasoning in *Kennedy* was further expanded to include "design professionals" such as engineers in *Tommy L. Griffin Plumbing & Heating v. Jordan, Jones & Goulding, Inc.*, 320 S.C. 49, 463 S.E.2d 85, 87–88 (1995). The court recognized, citing a number of cases nationwide, that "[i]n the last few years, a growing number of states have refused to apply the 'economic loss' rule to actions against design professionals when there is a 'special relationship' between the design professional and the contractor." *Id.* at 87. The question, thus, is not whether the damages are physical or economic. Rather the question of whether the plaintiff may maintain a tort action for purely economic loss turns on the determination of the source of the duty plaintiff claims the defendant owed. *Id.* at 88. "In most instances, a negligence action will not lie when the parties are in privity of contract. When, however, there is a special relationship between the alleged tortfeasor and the injured party not arising in contract, the breach of that duty of care will support a tort action." *Id.*

The *Griffin* decision went on to note that, though not couched in terms of economic loss, courts have consistently recognized tort actions for actions which do not cause personal injury or other property damage, such as legal and accounting malpractice. *Id.* at 89. "We see no logical reason to insulate design professionals from liability when the relationship between the design professional and the plaintiff is such that the design professional owes a professional duty to the plaintiff arising separate and distinct from any con-

tractual duties between the parties or with third parties." *Id.* (citations omitted). However, the South Carolina Court of Appeals, also in 1995, reaffirmed the general rule and concluded that "negligent misrepresentation is not applicable as a matter of law to this case under the economic loss rule," where the only damages alleged were lost anticipated profits. *Bishop Logging v. John Deere Indus.*, 317 S.C. 520, 455 S.E.2d 183, 189 (S.C.App.1995).

Finally, most recently, in *Palmetto Linen Svc., Inc. v. U.N.X., Inc.*, 205 F.3d 126, 128–130 (4th Cir.2000), the Fourth Circuit concluded that the economic loss rule applied to bar tort recovery to situations where the injuries were suffered by both goods and services provided by the defendants. The court rejected a claim of "special relationship" between the parties because the plaintiff "points to no professional duty on the part of defendants. Nor does [plaintiff] claim that defendants violated any code provision or contravened any industry standard." *Id.* at 129. The court also rejected a claim of damage to "other property" where "sophisticated parties" negotiated their own contract and should have contemplated the injury, thereby "rendering other property damage inseparable from the defect in the product itself." *Id.* at 129–30.

The above analysis demonstrates that the doctrine of economic loss is continually expanding, and is not as inviolate as it once was. Though there is authority from federal courts which could justify dismissal of the Plaintiff's negligence causes of action based upon the economic loss rule, *see Westinghouse Elec.*, 826 F.Supp. at 1555–57; *In re Ford Motor Co.*, 1996 WL 426548, at *2, the Court is not convinced that a "special relationship" or other extension of the *Kennedy* exception is untenable.

The case law discusses the existence of a "legal duty" between the parties outside a standard contract, and the existence and breach of "industry standards" as a basis for not applying the general rule. *See Griffin*, 463 S.E.2d at 88; *Palmetto Linen*, 205 F.3d at 129. Here, an automobile manufacturer, aside from any Safety Act provision requiring minimum standards, is required at common law to produce vehicles which are free of dangerous defects. Part of the proof of a potential defect, at common law, is the violation of certain "industry standards," including the amount of information and technology available to the manufacturer at the time the vehicle was produced. *See Bragg v. Hi-Ranger*, 319 S.C. 531, 462 S.E.2d 321, 328 (S.C.App. 1995).[1]

It is not inconceivable that an argument could be made to extend the use of "industry standards" to create an additional exception to the economic loss rule. However, it is not the role of this Court to expand upon South Carolina law. This Court was specifically reversed by the Fourth Circuit after anticipating a potential extension of Florida common law. *See Burris Chem., Inc. v. USX Corp.*, 10 F.3d 243, 247–48 (4th Cir.1993). The court reasoned that under the federalism provisions of *Erie R.*

---

**1.** The court held as follows, *id.* at 328 (citations omitted):

> Two tests have evolved to determine whether a product is in a defective condition unreasonably dangerous for its intended use. The first test is whether the product is unreasonably dangerous to the ordinary consumer or user given the conditions and circumstances that foreseeably attend the use of the product. Under the second test, a product is unreasonably dangerous and defective if the danger associated with the use of the product outweighs the utility of the product. The state of the art and industry standards are relevant to show both the reasonableness of the design and that the product is dangerous beyond the expectations of the ordinary consumer.

*Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), "the federal courts sitting in diversity rule upon state law as it exists and do not surmise or suggest its expansion." *Id.* at 247 (citing cases). The adoption of a position such as that which Plaintiff sets forth here would certainly be an extension of existing law, not a reasonable interpretation thereof. Thus, this Court could not, even if it wanted to, adopt the Plaintiff's position.

Given the fact, however, that the Court has dismissed the only claim over which it has original jurisdiction (after rejecting at hearing the Defendant's assertions with respect to diversity jurisdiction), the remaining negligence and breach of implied warranty claims are before the Court upon its supplemental jurisdiction, pursuant to 28 U.S.C. § 1367. This statute contemplates the very situation with which the Court is faced. Subsection (c) provides in relevant part as follows:

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if -
>
> > (1) the claim raises a novel or complex issue of State law,
> >
> > . . .
> >
> > (3) the district court has dismissed all claims over which it has original jurisdiction, or
> > (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

The first reason expressed by Congress is compelling in the present case. The state courts of South Carolina have found several exceptions to a rule which previously was air-tight, and have never to this Court's knowledge been presented squarely with an argument such as that present-ed here. While this Court cannot extend the existing law of the state, *see Burris Chem.,* 10 F.3d at 247, a declination of supplemental jurisdiction would afford the Plaintiff the opportunity to pursue his argument in the state court and on up through the courts of appeal. The Court considers this result to outweigh any "judicial economy" which may be promoted by keeping the case in federal court, and concludes that remand is the most appropriate action to take.[2]

### CONCLUSION

Based on the foregoing, it is

ORDERED as follows:

(1) the Plaintiff's motion to reconsider is denied;

(2) the Defendant's motion to dismiss is granted in part with respect to the negligent failure to recall cause of action;

(3) the Defendant's arguments with regard to original jurisdiction based upon diversity of citizenship are denied;

(4) having dismissed the only cause of action over which the Court has original jurisdiction, the Court declines to exercise its supplemental jurisdiction over the remaining state law claims, pursuant to 28 U.S.C. § 1367(c)(1);

(5) this case is REMANDED to the Court of Common Pleas for Beaufort County; and

(6) all other motions, including the remainder of the Defendant's motion to dismiss, are denied as moot.

**IT IS SO ORDERED.**

---

**2.** The Court also notes that, under 28 U.S.C. § 1367(c)(3), it does not need to have a compelling reason to decline supplemental jurisdiction where all federal causes of action have been dismissed. The Court feels, however, that the aforementioned extension of existing law is such a reason, were one required.